UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARC SEPANSKI,

               Plaintiff,

v.

JANI-KING, INC., and
JANI-KING OF BUFFALO, INC.

               Defendants.

**DECISION AND ORDER**
10-CV-518S

## I. INTRODUCTION

Plaintiff, Marc Sepanski, alleges that his former employer, Jani-King, Inc. and Jani-King of Buffalo, Inc., discriminated against him on the basis of his sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.* and New York State Human Rights Law ("NYSHRL") Section 296. Currently before this Court is Defendants' motion for summary judgment and Defendants' separate motion to strike several aspects of Plaintiff's response to that motion. For the following reasons, Defendants' motion to strike is granted in part and denied in part; and their motion for summary judgment is granted.

## II. BACKGROUND

### A. Facts[1]

In February of 2005 Marc Sepanski, a male, was hired as the assistant operations manager for Jani-King of Buffalo, a wholly owned subsidiary of Jani-King, Inc., located in Amherst New, York. (Defs.' Stmnt., ¶ 7; Docket No. 27-3; Patrick Aff., ¶ 3; Docket No. 8-2;

---

[1] This Court has accepted facts in each party's statement of undisputed facts (referred to as "Pl.'s Stmnt." and "Defs.' Stmnt." respectively) to the extent that they have not been controverted by the opposing party. See Local Rule 56(a)(2) (statements not specifically controverted are deemed admitted).

Speanksi Aff., ¶ 4; Docket No. 35-1.) It offers commercial cleaning and janitorial services to local businesses. (Defs.' Stmnt., ¶ 5.) Diane Honeck, a woman who was hired in July 2005 as the Operations Manager, supervised Sepanski. (Id., ¶ 15.) It appears that the two got along until late December of 2005, when Honeck allegedly made the following remarks to Sepanski: "Why don't you grow some balls" and "how did you and the wife ever have kids if you don't have any balls." (Id., ¶ 19). At least from that point on, Sepanski and Honeck had a contentious relationship. In an affidavit submitted to this Court in opposition to the motion for summary judgment, Sepanski alleges that Honeck mocked men, and especially Sepanski, "essentially daily." (Sepanski Aff., ¶ 6; Docket No. 35-1.) But at his deposition, Sepanski recounted only three additional specific incidents of alleged harassment.

In February of 2006, during a morning meeting, Honeck called men "worthless" and blamed a mess in the break room on Sepanski because he was a man. "Typical men," she said, "make a mess." From that day on, according to Sepanski, she "stayed on [his] case about it." (Sepanski Dep., 18:5–13, 22; Docket No. 27-4.)

Shortly after that incident, Honeck called men and cats "the worst thing God created." (Id.,19: 2–5.)

Last, on Wednesday, March 8, 2006, Sepanski returned to the office at about 4:30 p.m. and before he was "even inside the door, [Honeck] started screaming at me about men." She said, "men can get away with anything, right, Marc." (Id., 23:15–20.) At this point, Sepanski had "had enough," and voiced complaints about Honeck to Joseph Stein, the regional director and head of the Jani-King of Buffalo office. Id. This was the third time that Sepanski complained about Honeck. Previously, he twice complained to Kimberly

2

Hout, the office manager, and, as a result of these conversations, Honeck had apparently been reprimanded. (Defs.' Stmnt., ¶ 27.)

From there, the course of events take a strange, and largely unexplained turn. After complaining about Honeck, Stein told Sepanski to take Thursday and Friday of that week off and that Sepanski should contact him on Monday. In the interim, Stein would handle the problem with Honeck. (Sepanski Dep., 31:12–15.) Sepanski did as he was instructed, but when he called on Monday, Stein did not answer the phone. It turns out that, in the course of just a couple of days, Stein had fired Honeck and shortly after that, Jimmy Petrick, the executive director for Jani-King International, Inc., the parent of Jani-King, Inc., flew in from Texas and fired Joe Stein for "lack of performance of growing revenue and selling franchises." (Petrick Dep., 27:11; Petrick Aff., ¶ 2; Docket No. 8-2.)

At some point around this time, Petrick instructed Hout, the office manager, and her daughter, Corine Consiglio, another Jani-King of Buffalo employee,[2] to locate Sepanski. According to Petrick, after placing several calls and visiting his house, they were unable to do so. (Petrick Dep., 17:11–18.) Thus, believing that Sepanski was absent from work without leave, Petrick fired Sepanski. (Id.,16:16–20.)[3] Oddly, Sepanski learned of his firing through Hout, who told him that Petrick did not "want [him] back in the building." Sepanski took Hout at her word – he never inquired any further – and met her at a local McDonald's to give back his office keys and a company cell phone. (Sepanski Dep., 33:15–20.)

---

[2]It appears that these four – Hout, Consiglio, Honeck, and Stein – were only people who worked at the Amherst Office with Sepanski.

[3]Sepanski, however, testified that Hout told him that she told Petrick that Sepanski had been on vacation. But this Court has not been presented with any admissible testimony from Hout herself.

3

In an even stranger twist, Hout compiled the papers documenting Sepanski's removal from the company and, in the "Exit Report," marked the "type of separation" as "resignation." Petrick signed the form, but crossed out the box indicating "without reservation," which Hout had checked, and instead checked the box indicating "with some reservation" because "he had never met Mr. Sepanski." (Petrick Dep., 19:22. ) Petrick goes on to explain, "If he would have just come in and talked, I would have filled out the form differently, probably." (Id., 20:3–4.) Sepanski sharply disputes any characterization of his removal as a "resignation"; he believes he was fired.

Stranger still, Petrick then reinstated Honeck sometime during the next week (id., 29:12–13), only to fire her several months later because of her "negative attitude towards several franchise owners," (id., 29:23).

Sepanski never again worked for Jani-King. On January 3, 2007, he filed a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Jani-King, Inc. Subsequently, on March 23, 2010, the EEOC mailed Sepanski his "right-to-sue" letter, authorizing Sepanski to bring this suit in federal court.

**B.  Procedural History**

Sepanski filed a complaint with this Court on June 21, 2010. (Docket No. 1.) On November 22, 2010, Defendants moved to dismiss the case or transfer it to a district court in Texas. After full briefing, this Court denied that motion on September 30, 2011. (Docket No. 16.) Defendants then answered the complaint, the parties conducted discovery, and on December 12, 2012, Defendants' filed the motion for summary judgment. After Sepanski filed his responsive papers, Defendants moved to strike several aspects of those

papers on February 20, 2013. Briefing on that motion concluded on March 21, 2013, at which time this Court took both motions under consideration.

## III. DISCUSSION

### A. Defendants' Motion to Strike

One aspect of Defendants' motion to strike is intertwined with their motion for summary judgment, and, as such, it will be addressed in connection with that motion. But another component of the motion to strike requires immediate discussion.

In his response to Defendants' motion for summary judgment, Sepanski filed three letters authored by Kimberly Hout, Joseph Stein, and Corine Consiglio, all of whom worked with Sepanski during the relevant time period. According to Sepanski, these letters were drafted to support his application for unemployment benefits. They are, however, merely signed by a notary – they are neither sworn, nor are their contents stated to be true and correct, nor are they stated under penalty of perjury. For this reason, they do not constitute competent evidence. See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65–66 (2d Cir.1999) (noting that the Second Circuit has "held that a district court should disregard an unsworn letter in ruling on a summary judgment motion"); Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1988); Marino v. Jonke, No. 11 CV 430 VB, 2012 WL 1871623, at *4 (S.D.N.Y. Mar. 30, 2012); see also DeMars v. O'Flynn, 287 F. Supp. 2d 230, 242 (W.D.N.Y. 2003) (quoting Flowers v. Abex Corp., 580 F.Supp. 1230, 1233 n. 2 (N.D. Ill. 1984)) ("Merely notarizing the signature does not transform a letter into an affidavit"). Sepanski urges this Court to accept the letters because lying to the New York State Unemployment Insurance Board "could constitute fraud." (Pl.'s Mem. in response to Motion to Strike, at 5; Docket No. 42.) But he provides no authority for the proposition that

5

the body to which an unsworn letter is submitted can somehow transform it into competent evidence. Despite having notice of this deficiency through Defendants' motion to strike, Sepanski failed to cure the purported affidavits. Accordingly, Defendants' motion to strike these letters is granted, and this Court will not consider them in connection with the motion for summary judgment.

**B.    Defendants' Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the

court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

****

Sepanski contends that his treatment at Jani-King of Buffalo, specifically at the hands of Honeck, created a hostile work environment and constituted sex discrimination in violation of Title VII and the New York State Human Rights Law. He further contends that he was retaliated against for complaining about this hostile environment. Defendants raise several arguments in response, contending that (1) Jani-King, Inc. (as opposed to Jani-King of Buffalo) is not Sepanski's employer as defined by either the NYSHRL or Title VII; (2) the NYSHRL claim is barred by the statute of limitations; generally (3) Sepanski has not submitted sufficient evidence to carry his burden on any of the claims; and (4) even if Sepanski could meet his burden, Jani-King of Buffalo cannot be held liable because it took steps to prevent and correct any harassing behavior.

For two related reasons, this Court will address only Defendants' third argument. First, even if this Court were to rule in Defendants' favor on the first two points, Sepanski's Title VII claim against Jani-King of Buffalo would remain viable. Second, this Court finds that Sepanski's Title VII claim, which is analyzed under the same standard as the NYSRHL claim, see Schiano v. Quality Payroll Sys., Inc., 609 (2d Cir. 2006), whether asserted against Jani-King of Buffalo or Jani-King, Inc. ,must be dismissed on the merits, rendering moot all other potential reasons for dismissal.

1.  **Hostile Work Environment**

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003).

To maintain a hostile-work-environment claim under Title VII, a plaintiff must submit sufficient evidence demonstrating that (1) the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that (2) a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997) (internal citations and quotation marks omitted). For the first prong – the only one in contention at this point – "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances," Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000), which include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Dawson v. County of Westchester, 373 F.3d 265, 272–73 (2d Cir. 2004).

****

There is a pointed dispute over just how frequently Honeck made derogatory remarks towards Sepanski, a dispute that is engendered by Sepanski's often confusing and sometimes contradictory deposition.

To illustrate, Sepanski first testified that, from the time he was hired in February 2005, Honeck and he "got along" and that everything was going fine until the next year, February 2006. (Sepanski Dep., 12:24; 15:19–22.) But he then stated that "every morning" there was a meeting where Honeck would "just bash[] men," and "every time she bashed the men, my name was always brought up with it." (Id., 16:5–9.) Sepanski was asked to provide an example of this treatment, and so he recounted an incident from December of 2005 when Honeck remarked: "Why don't you grow some balls? How did you and the wife ever have kids if you don't have any balls." (Id., 16:11 – 17:1.) Yet, when asked if this was the *first incident* of harassment or discrimination, Sepanski responded, "I believe so." (Id., 18:2.)

Sepanski was then asked to recount the next incident of harassment. In response to that question he again referenced the morning meetings, and said that Honeck "always" said "men are worthless." (Id., 18:5–6.) He also recounted a time in February 2006 when Honeck blamed a mess in the break room on him. The following exchange then occurred:

> Q: Okay. And so it sounds like that's the second time then that she made some sort of derogatory statement towards you?
> A: Yes.
> Q: And was that -- are there any other statements other than that or after that time period?
> A: Umm, right after she made comments of the worst thing God created was cats and men.
> Q: And where was this made?
> A: In the office.
> Q: And, again, what was the timing of this one?

9

> A: I believe it was in February.
> Q: February of 2006?
> A: Mm-hmm.

(Id., 18:23 – 19:11.)[4]

Later in the deposition, Sepanski explained another instance of harassment. On March 8, 2006, Sepanski returned to the office at about 4:30 p.m. and before he was "even inside the door, [Honeck] started screaming at me about men." She said, "men can get away with anything, right, Marc." (Id., 23:15–20.)

Shortly after recounting this experience, this exchange occurred:

> Q: And then it was after that -- all right. Other than the four
> incidents of alleged harassment that we've talked about,
> were there any other alleged incidents of harassment by
> Miss Honeck against you?
> A: Not that I can recall.
> **Q: And were there -- other than the four incidents we've
> talked about today already, were there any other alleged
> incidents of discrimination by Miss Honeck against
> you?**
> **A: Not that I can recall.**

(Id., 30:5–14.)

But this limited picture of harassment – only four incidents – is not the picture Sepanski tries to paint in response to the summary judgment motion. In response, Sepanski filed an affidavit charging that Honeck made derogatory remarks directed to him on an "essentially daily" basis when they were both in the office. (Sepanski Aff. ¶ 5.) In his memorandum of law, he argues that "the record establishes a constant, unopposed, and relentless stream of sexually harassing remarks made by one woman." The memorandum goes on to argue that he "endured over 250 separate instances of harassment," and that

---
[4]Questions were asked by Defendants' attorney. The answers are Sepanski's.

there were "potentially hundreds of remarks by Ms. Honeck towards Mr. Sepanski that belittled him on the basis of sex[;] they were personal, intimate attacks, involving his family in a clearly demeaning context." (Pl.'s Mem. at 1, 9; Docket No. 36.) These numbers appear to derive from Sepanski's statement in his affidavit that he was subject to harassment every day; Sepanski's attorney has apparently added each day he worked at Jani-Kang to arrive at this number.

Defendants, however, move to strike Sepanski's affidavit as contradictory to his deposition testimony. Indeed, "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts h[is] own prior deposition testimony." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir.1999). Although this affidavit does partially appear to be an improper attempt to cure Sepanski's deposition testimony, it is arguably consistent with that portion of the deposition where Sepanski claims that Honeck made derogatory remarks at morning meetings. Granted, it is contradictory to Sepanski's representation that there were only four incidents of harassment; but then again, the deposition testimony itself is contradictory. On balance then, this Court finds that the affirmation adds little to the deposition testimony, and this Court will consider it only insofar as it claims that Honeck make derogatory remarks at morning meetings.

So considered, and accounting for the totality of the circumstances, this Court cannot find that Sepanski's workplace was "severely permeated with discriminatory intimidation, ridicule, and insult" so as to create a hostile work environment. Alfano, 294 F.3d at 374.

Sepanski himself cannot recount the times he was subject to harassment on account of his sex. His own testimony, which is the only competent evidence before this Court supporting his claim, is vague and changeable. Though he makes passing reference to repeated harassment occurring at morning meetings, he provides only a handful of specific instances where Honeck referred to men in a derogatory fashion. More is required: "past cases underscore that mere generalized allegations that [discriminatory] remarks abound in the workplace will not provide a sufficient basis for proceeding to trial." Kemp v. A & J Produce Corp., 164 F. App'x 12, 15 (2d Cir. 2005) (summary order). And while possibly offensive, the comments that Sepanski does identify are not sufficiently severe or humiliating. In fact, two comments identified by Sepanski, those referring to men as able to "get away with anything" and as "messy," border on innocuous. A third comment, that "the worst thing God created was cats and men," is relatively mild. Further, Sepanski was never touched inappropriately, he not was he physically or verbally threatened, and he was not propositioned. As the Supreme Court has instructed, "properly applied," the standards for judging hostility, "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998). The Court made it clear that "conduct must be extreme to amount to a change in the terms and conditions of employment" and thus be actionable under Title VII. Id. The conduct at issue here falls short of that standard.

It is an oft-repeated holding that Title VII is not a "general civility code." See, e.g., Thomas v. City of New York, --- F. Supp. 2d. —, No. 11 CIV. 5978 BMC, 2013 WL 3753557, at *6 (E.D.N.Y. July 12, 2013). If it were, Defendants may be liable. But under

these facts, and considering the only evidence before this Court is Sepanski's own erratic testimony, which offers only four specific instances of harassment (three of which are relatively harmless), a reasonable jury could not find that Defendants created a hostile work environment as defined by Title VII.

### 2. Sex Discrimination

Sex discrimination claims under Title VII are distinct form hostile-work environment claims. Claims of this nature are analyzed under the Supreme Court's familiar McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). Under that framework, a plaintiff must first establish a prima facie case by adducing sufficient evidence to permit a rational trier of fact to find that he: (1) is a member of a protected class; (2) was qualified for his position and performing his duties satisfactorily; (3) was subject to an adverse employment action (4) suffered under "circumstances giving rise to an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128, 137–38 (2d Cir. 2003); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). The Second Circuit has explained that an action must cause a "materially adverse change in the terms and conditions of employment," and not just "mere inconvenience," in order to qualify as "adverse." Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (internal quotation marks and citations omitted).

Sepanski claims that he was discharged on account of his sex. Defendants argue that this claim borders on the frivolous; this Court must agree.

First, it must be noted that the evidence clearly demonstrates that James Petrick, not Honeck, fired Sepanski. Honeck – the only person in this case who has shown any

13

predilection for sex-based animus – had in fact already been fired herself by the time Sepanski was released, and there is no evidence to suggest that Honeck had any input whatsoever in the decision to fire Sepanski.

Second, the evidence also establishes that Petrick did not even know who Sepanski was; he had never even met him before he signed the papers authorizing his removal. Sepanski speculates that Petrick knew about the harassment and knew that Sepanski had been given vacation time before releasing him. Thus, according to Sepanski, Petrick endorsed the alleged harassment. Sepanski's release, he argues, was simply an extension of Honeck's harassment. But even if Petrick was aware of the alleged harassment and the events of the preceding week, it remains pure speculation to assert that Petrick thus endorsed that harassment and fired Sepanski because he approved of Honeck's treatment of him. Indeed, Petrick testified that he changed the "Exit Form" document to reflect the fact the he had reservations about releasing Sepanski because he had never met him. Although Sepanski's release occurred in the context of an admittedly strange set of circumstances, no evidence suggests that Sepanski was fired because he is a male. Because Sepanski has failed to adduce sufficient evidence to support his prima facie case, this claim must be dismissed.

### 3. Retaliation

Like claims of sex-based discrimination, retaliation claims under Title VII are evaluated under the same three-step burden-shifting analysis outlined above. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir.1998). To establish a prima facie retaliation case, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4)

a causal connection between the protected activity and the adverse employment action." McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001).

There is no dispute that Sepanski lodged complaints against Honeck to their supervisor, Joseph Stein. This constitutes protected activity under Title VII. See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). To support his contention that he was retaliated against for making those complaints, Sepanski relies on the Second Circuit holding that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [third] prong of the retaliation prima facie case." Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir.1999), *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). But this Court has already found that the conduct identified by Sepanski was insufficiently severe. It cannot be said, then, that the continuation of that activity could constitute a materailly adverse condition. Indeed, conduct that "causes a plaintiff 'embarrassment or anxiety' [is] insufficient to qualify as an adverse action because 'such intangible consequences are not materially adverse alterations of employment conditions.'" Miksic v. TD Ameritrade Holding Corp., No. 12 CIV. 4446 AJN, 2013 WL 1803956, at *3 (S.D.N.Y. Mar. 7, 2013) (quoting Castro v. New York City Bd. of Educ. Pers., No. 96 CIV. 6314 (MBM), 1998 WL 108004, at* 7 (S.D.N.Y. Mar. 12, 1998)).

Further, there is no evidence that Sepanski's discharge was connected in any fashion to the complaints he lodged against Honeck. To the contrary, it appears Honeck was fired because of his complaints, and there is no evidence to suggest that Petrick, who eventually discharged Sepanski, did so because of complaints Sepanski made about Honeck. Any alleged connection, even one based on temporal proximity, is simply too

tenuous and speculative to withstand summary judgment. Therefore, the retaliation claim must be dismissed.

## IV. CONCLUSION

In an effort to defeat summary judgment, Plaintiff has submitted three unsworn letters. But those letters cannot be considered in connection with such a motion, and they must be disregarded. The remaining evidence is insufficient to support a claim that Sepanski's employer violated Title VII and the New York Human Rights Law. For those reasons, Defendants' motion to strike is granted in part, and its motion for summary judgment is granted in full.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 27) is GRANTED.

FURTHER, Defendants' Motion to Strike (Docket No. 40) is GRANTED in part and DENIED in part.

FURTHER, the Clerk of Court shall close this case.


Dated: August 16, 2013
        Buffalo, New York

                                            /s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                            Chief Judge
                                            United States District Court